In the Matter of the Accounting of HERMAN J. TART, as Coexecutor of WLADIMIR BERENSON, Deceased, Appellant. ANTONIE BERENSON-CHIRKIN, Appellant; VLADIMIR VICAS, Respondent.

First Department, June 21, 1954.

*John F. X. Finn* of counsel (*Tart Bros. & Wald,* attorneys), for Herman J. Tart, as executor, appellant.

*Robert H. Peterson* of counsel (*Jas. Maxwell Fassett,* attorney), for Antonie Berenson-Chirkin, appellant.

*Leo J. Friedman* of counsel (*Arthur J. Brothers,* attorney), for respondent.

BERGAN, J. In his lifetime the deceased Wladimir Berenson held for the account of the objectant Vladimir Vicas " about $8,000 ". Berenson was related to Vicas and referred to him as " my cousin ". The indebtedness of decedent to Vicas was expressed in a cryptic written form. A letter was addressed to Vicas, dated June 27, 1942, which said, merely: " By this letter I affirm that I have at your disposition about $8,000 ".

The letter was written in Russian which both men understood. We are not otherwise advised about the nature of the obligation.

In the three months before he died on May 31, 1943, Berenson paid Vicas $7,988 which quite literally fulfills the sum of " about $8,000 " which decedent had at his " disposition ". It would be taken quite as a matter of course that this payment to objectant by the decedent just before he died of the money he had stated he held for him would have requited the decedent's obligation in full.

But objectant seeks to avoid the effect of this conceded payment to him by a curiously disingenuous assertion that the money he received from Berenson was for something quite different; and he argues that the estate still owes him $8,000. The claim was not presented until October 21, 1948, between five and six years after decedent's death. The Surrogate after a trial held, however, that the claim of objectant is good. He also denied a motion made by the coexecutor for a new trial based on newly discovered evidence.

Payment of the $7,988 was made by the decedent to Vicas in three separate checks in 1943. One was March 8th for $2,280; one March 19th for $2,208 and one April 19th for $3,500. The claim of Vicas was that he was dealing in diamonds; that he had just come from Europe and " was frozen " and for some reason, not made entirely clear to us, he could not have a bank account; that in order to do the kind of business in diamonds Vicas wanted to do, a business described as dealing in " little diamonds ", it was required that checks be used for payments and that cash was quite unacceptable in the market among the dealers in these transactions.

The witness who testified to all these details was Roman S. Tumarkin, who had known Vicas his " whole life " and was a joint adventurer in the diamond transactions with him. " I proposed " he said to Vicas " buying little diamonds ". He testified further that when Vicas suggested putting in cash for the venture, " I told him that it is impossible but in our business it is possible only checks. He answered me, he said, he is frozen; he is coming only a few months from France and he cannot give a check." Tumarkin testified that Vicas then said that perhaps Berenson " can help us ".

Vicas then made an arrangement, according to Tumarkin's testimony, by which he would give the decedent Berenson cash and Berenson would give Vicas the equivalent of the cash in checks so Vicas could have ready at hand the medium which would satisfy the diamond dealers.

It is argued by Vicas here that in each of these three transactions in which Vicas was given a check the consideration was an exchange of cash given by Vicas to Berenson; and that it was intended by Vicas to use the checks thus obtained in diamond transactions. This is the sole theory upon which it is sought to avoid the inference of payment of decedent's obligation to Vicas of about $8,000. The objectant's version of these transactions seems quite incredible.

The device becomes more transparent when the record is closely examined. The first check for $2,280 of March 8, 1943, was drawn by the decedent on the Chase Bank. It was made out to cash, but it was indorsed by objectant Vicas. It did not go to a diamond dealer. The indorsement after that of Vicas is the bank indorsement of the Central Savings Bank. This sequence of indorsement suggests two things: (a) that Vicas did not get the check in order to have a medium to deal with in the diamond market; and (b) that Vicas not only could have had, but actually did have a bank account, since there is a direct savings bank indorsement following his indorsement which would not ordinarily be made unless the payee has an account. There is written on the check a notation indicating a savings bank account number.

The other two checks were drawn by decedent on the National City Bank on an account of his wife for whom decedent had power of attorney. Both are drawn to the order of the witness Tumarkin but Vicas concedes he received the proceeds.

Both the check dated March 19, 1943, for $2,208 and the check dated April 19, 1943, for $3,500 were cashed. On April 19th the decedent deposited $3,600 in the National City Bank account and the deposit slip was in the handwriting of Vicas. Tumarkin testified Vicas deposited the money in decedent's presence. Tumarkin also testified the decedent was at that time " very sick ".

On the trial Vicas offered a transcript of the Berenson National City account in evidence. This transcript discloses that the check for $2,208 dated March 19th was paid on the same day by the bank. The transcript does not show a contemporaneous deposit on that day of an equivalent amount. Such a contemporaneous deposit, if made, might have tended to support Vicas' contention that he bought the decedent's check with his own cash. It shows, on the contrary, a deposit of $2,411.20 three days before, the significance of which will be treated on that part of the appeal dealing with the motion for a new trial.

The check for $2,208 which Vicas received would not have been good without this deposit of $2,411.20.

Moreover, the check of March 19th for $2,208 was paid in cash immediately to Tumarkin, the joint adventurer with Vicas, as it shows on its face and by its indorsement, and this, of course, is entirely inconsistent with the theory of Vicas that he was buying the decedent's check because the diamond market in which he dealt required checks as a business medium.

It may well have been that the money with which the decedent repaid Vicas was used by him in the venture with Tumarkin and the fact that two of the three checks were issued to Tumarkin suggests this; but the odd amount of the deposit of $2,411.20 made, not on the date of the second check was issued, but two days before; and not in the same amount but for $203.20 more, strongly suggest that the source of that deposit was not cash given by Vicas to buy the check, but from some other and different resource of decedent.

It is patent from an examination of the photostat of the check that it was not used in the diamond market at all but immediately converted into cash by the joint adventurer himself. The heavy reflection on credibility of the testimony in support of Vicas' theory cast by the manifest inconsistency between the testimony in support of the diamond transactions and the actual and undisputed check and bank records of the first two transactions thus has its own adverse impact on the third check transaction.

The National City Bank account shows that on April 19th a deposit of $3,600 was made. The bank deposit slip offered by objectant showed that this deposit was in cash, and the slip was in the handwriting of the objectant Vicas. On the same day the check for $3,500 was drawn by decedent to the witness Tumarkin. It was cashed on the same day at the Fifth Avenue Branch of the Empire Trust Company.

The only indorsements it bears, other than Tumarkin's, are bank indorsements. It is obvious that it went directly from the hands of Tumarkin to a bank where it was cashed. It is likewise obvious, therefore, that it, too, had no direct utilization as a check in the "little diamond business". We see nothing unusual in Vicas having made out the deposit slip for the deposit of money in the account of decedent without which the check for $3,500 which was just the amount needed to fill out and completely satisfy the balance of the sum of "about $8,000" due him from the decedent would not have been in the National City account.

It is entirely consistent with Vicas' interest in getting his indebtedness paid that he make out this deposit slip for decedent and it was the observation of the witness Tumarkin who testified to the deposit being made that decedent was then a " very sick " man. The further significance of the deposit of $3,600 on April 19th will be discussed on the question of the review of the motion for a new trial.

Decedent having taken the trouble to acknowledge his obligation to Vicas in a formal written admission it was quite reasonable for him to take the precaution in view of his serious illness and possible death of having some written proof through his own bank account and in that of his wife that the obligation was paid, and the concession on the trial indicates that a payment to Tumarkin was regarded by everyone concerned as a payment to Vicas.

When the record as thus actually developed on the trial before the Surrogate is examined and sifted through, the documentary proof strongly suggests the fabrication of the Vicas theory of the consideration for which decedent gave him the three checks, the proceeds of which he concededly received.

Every reasonable probability suggests that they were given to pay the obligation which decedent had to Vicas, and nothing about the course of transaction as to any of the checks fits naturally or consistently into the theory that they were checks bought by Vicas from the decedent to be used in the diamond business. There is a recurring incongruity between the theory and hard and incontestable fact.

Thus far we have dealt only with the facts as they developed on the trial. But even if the Surrogate felt justified in finding for the objectant on the record of the trial before him, the additional proof shown on the motion for a new trial suggested strongly that the case required further examination. The papers on that motion disclosed evidence which had come to the attention of the coexecutor after the trial.

One thing then demonstrated was the source of the deposit which made possible the payment of the sum of $2,280 to Vicas from the Chase Bank account by the check dated March 8th. This deposit was in the sum of $2,873.80, and was shown by the moving papers to have come from a transfer of credit in the Chase Bank dated March 5, 1943, made not by Vicas, but by Bear, Stearns and Co., stockbrokers, to the account of the decedent.

The moving coexecutor's papers also showed the exact source of the deposit of $2,411.20 in the National City Bank on March

16th which has been referred to and which made possible the payment of the check to Vicas on March 19th. This precise amount of $2,411.20 was received on March 12th, not from Vicas, but from the sale of 110 shares of Warren Brothers Class B stock from a broker who held the stock in the name of a nominee for the decedent.

Further it was shown in the moving papers that the sale of 300 shares of New York Central stock on April 9, 1943, for $5,100.45 by the decedent was prima facie the source of the $3,600 deposited on April 19th in the National City Bank. Other bank records read together with this deposit account for all but $.45 of the disposition of the proceeds of this stock which was held in the decedent's name. All of this tends to show a liquidation of assets by decedent just before his death in order to satisfy Vicas.

There is testimony by Eugenia Temkin, an aunt of the decedent and a '' good friend from Moscow '' of Vicas that when the decedent was in the hospital just before his death he told her that she should '' Remember and don't forget '' that '' I owe my cousin '' Vicas $8,000. It would be unreasonable to credit this one statement attributed to a dying man against the clear documentary proof of payment in order to help sustain a tenuous theory which when the record is seen as a whole does not explain away or meet fairly plain and undisputed facts.

The moving affidavit for a new trial also called attention to the fact that the check of March 8, 1943, in the sum of $2,280 had been cashed by Vicas himself through the Central Savings Bank, a fact which had escaped attention of counsel at the trial, and called attention to the testimony on behalf of Vicas that he had no bank account in 1943. Vicas himself made no affidavit in answer to this, and the answering affidavit by Vicas' attorney does not deny that Vicas had such a bank account in the Central Savings Bank and omits all reference to that subject.

In this court it was suggested to the parties that a transcript of the Chase account of the decedent be furnished for our examination. This was produced and filed with us and it also shows, as we have seen from the moving papers on the motion, that on March 5, 1943, the sum of $2,873.80 was credited to that account. This is the precise amount and the exact date of transfer of the credit from Bear, Stearns and Co. to the decedent's account, and without which credit the first Vicas check could not have been paid.

The attorney for the executor asks in a letter that this court issue a subpœna to the Central Savings Bank to produce here

all accounts which it may have had in the name of Vicas. The attorney for Vicas objects to the issuance of such a subpœna without an opportunity to be heard. We have concluded that it would be preferable to have a new inquiry before the Surrogate with full opportunity to both sides to produce and controvert such additional proof as may be relevant. There should be a careful re-examination of the facts.

The decree sustaining the objections of objectant Vicas and the order denying the coexecutor's application for a new trial should be reversed and the motion for a new trial granted, with costs to appellants to abide the event.

Peck, P. J., Cohn, Callahan and Bastow, JJ., concur.

Decree and order unanimously reversed and the motion for a new trial granted, with costs to the appellants to abide the event.